1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10 GEORGE WASHINGTON, JR.,    )   1:08-CV-01721 AWI GSA HC
                   )
11          Petitioner,   )   FINDINGS AND RECOMMENDATION
                   )   REGARDING PETITION FOR WRIT OF
12    v.               )   HABEAS CORPUS
                   )
13                   )
M. McDONALD,        )
14                   )
         Respondent.  )
15 _____)

16
17      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
pursuant to 28 U.S.C. § 2254.

18
## PROCEDURAL BACKGROUND

19
20      Petitioner is currently in the custody of the California Department of Corrections pursuant to
a judgment of the Superior Court of California, County of Fresno, Hon. R. L. Putnam presiding,
21
following his conviction by jury trial on December 9, 2005, of second degree robbery with personal
22
use of a firearm (Cal. Penal Code §§ 211, 12022.53(b)) and possession of a firearm by an ex-felon
23
with a prior serious felony conviction (Cal. Penal Code §§ 12021(a)(1), 667(a)(1)). (LD 3.[1]) On
24
February 16, 2006, he was sentenced to state prison for a determinate term of twenty-six years. (LD
25
1.)
26
      Petitioner timely appealed to the California Court of Appeals, Fifth Appellate District. On
27

28           [1]"LD" refers to the documents lodged by Respondent with his answer.

August 7, 2007, the judgment was affirmed. (LD 3.) Petitioner then filed a petition for review in the California Supreme Court. (LD 4.) On November 14, 2007, the petition was summarily denied. (LD 5.)

On October 31, 2008, Petitioner filed the instant federal habeas petition in the Sacramento Division of this Court. On November 12, 2008, the petition was ordered transferred to the Fresno Division. Respondent filed an answer to the petition on March 20, 2009.  Petitioner did not file a traverse.

## FACTUAL BACKGROUND[2]

### *Introduction*

During a two-week period in November 2004, a number of armed robberies took place at businesses in the city of Fresno. The robbery sites included:

Tower Health on North Fulton Street on November 5, 2004;

Little Caesars Pizza on West Shaw Avenue on November 8, 2004;

Subway Sandwich Shop on North Palm Avenue on November 11, 2004;

Little Caesars Pizza on West Clinton Avenue on November 14, 2004; and

Subway Sandwich Shop on East Gettysburg Avenue on November 16, 2004.

On August 30, 2005, the district attorney filed an information against appellant and codefendant Charles Paul Wilson. The information charged Wilson with weapons possession and multiple counts of robbery, among other things. The information charged appellant with weapons possession and the robbery which occurred on November 8, 2004, at the Little Caesars Pizza on Shaw Avenue. The November 8, 2004, robbery was recorded on a surveillance video.[FN2] Robert Thomas was a fellow drug user of appellant and Wilson. Appellant allegedly told Thomas about a number of charged and uncharged robberies he had committed with Wilson. The court severed the trials of Wilson and appellant. In appellant's trial the court admitted evidence of the uncharged robberies to support the credibility of Thomas.

FN2. The parties stipulated that the video surveillance cameras were running properly at Tower Health and the Little Caesars Pizza restaurants on West Shaw Avenue and West Clinton Avenue at the time of the respective robberies. The parties further stipulated the surveillance recordings were properly recovered and booked into evidence. The prosecution showed the jury still frames from those video recordings. The parties also stipulated that none of the fingerprints recovered from any of the robberies matched fingerprints in the California fingerprint database or matched the prints of appellant or Wilson.

---

[2]The factual background is taken from the opinion of the state appellate court and is presumed correct. 28 U.S.C. § 2254(e)(1).

*Evidence of the Charged Offenses*

**Facts underlying the November 8, 2004 robbery of Little Caesars Pizza on West Shaw Avenue**

At 6:15 p.m. on November 8, 2004, Jose Cruz was working at the counter of the Little Caesars restaurant on West Shaw Avenue in Fresno. He looked through the front window and saw two African-American men pacing in front of the restaurant. One of the men was tall and lean and the other was short and stocky. The two men eventually entered the restaurant. The tall man walked around the counter while the short man opened a dark bag and pulled out a silver revolver with a wooden handle. The short man pointed the gun at Cruz and demanded money. Cruz, in shock, handed over some money and one of the robbers grabbed more money from the restaurant cash register. Cruz did not focus on the robbers' faces because he was preoccupied by the weapon and with providing money to the robbers.

After the robbers left the restaurant, Cruz summoned Fresno police. Cruz told officers the shorter robber was 30 to 35 years of age, had a fade haircut, and wore a baseball cap or a hooded sweatshirt. Cruz said the gun was probably a silver revolver and the entire incident lasted less than a minute. At trial, the parties stipulated that Fresno police recovered latent fingerprints from the Little Caesars restaurant on the date of the robbery and that none matched the fingerprints of appellant or his acquaintances, Charles Paul Wilson, Robert Thomas, and Paul Benefield.

On November 21, 2004, Cruz examined a photographic lineup and identified Wilson as one of the robbers. On September 24, 2005, more than 10 months after the robbery, Cruz viewed another photographic lineup. That lineup had appellant's picture in the number six position. Cruz said the individual depicted in position number two looked familiar and commented, "It's been awhile." However, Cruz did not identify appellant from the lineup. At a prior court hearing, Cruz identified Wilson as the tall robber. At appellant's trial, however, Cruz testified he did not recognize anyone from the robbery in the courtroom. Cruz also said no one in the courtroom resembled the shorter robber.

At appellant's trial, Cruz identified People's exhibit No. 18 as the gun used by the shorter robber. Cruz testified that People's exhibit No. 19 did not look like the robber's bag. He said the robber's bag looked like a bank bag, that being a narrow bag with a zipper on top. At a prior hearing, Cruz described the robber's bag as having a top zipper. Cruz said the bag he saw looked different than People's exhibit No. 19 but did resemble it in size.

The parties stipulated that the video surveillance cameras were running properly at the West Shaw location of Little Caesars on November 8, 2004. The jurors watched a videotape, without audio, of still photos of the actual robbery (People's exhibit No. 17). Cruz viewed the videotape at trial but said it did not refresh his memory of the shorter robber. Robert Thomas testified he recognized appellant and Wilson from the video footage and said appellant was the robber with the gun. He also testified he recognized appellant based on the coat and jeans worn by the robber, the gun he used, and the robber's hair and facial features. Thomas also said he could see certain details in the image and testified "I see it's his [appellant's] nose."

At trial, Fresno Police Detective Raymond Camacho, the chief investigating officer, testified the videotape of the robbery depicted a tall, lean assailant and a shorter assailant. Camacho said appellant and Charles Wilson positively matched those subjects. In Camacho's opinion, Robert Thomas was not depicted in the videotape because Thomas was bald and had a rounder head and stockier build than the robbers in the videotape. In Camacho's view, People's exhibit No. 18A [FN3] resembled the gun in the video because it was a silver revolver. However, Camacho acknowledged that exhibit No. 18A might not necessarily be the same weapon as that used by the robbers.

FN3. People's exhibit No. 18 consisted of a white evidence box containing People's exhibit No. 18A. People's exhibit No. 18A consisted of a Smith & Wesson .38 special.

**Facts underlying the arrest and investigation**

On the evening of November 16, 2004, Fresno Police Sergeant Elizabeth Marmolejo was on patrol duty. Sergeant Marmolejo was supervisor of the Northwest District Crime Suppression Team, which focused on serial crimes. That evening she noticed a Jeep Cherokee that matched the description of a suspect vehicle in a police briefing bulletin. The briefing bulletin described the vehicle as being a light brown or tan Jeep Cherokee.[FN4]

FN4. Sergeant Marmolejo identified the suspect vehicle from photographs introduced into evidence in court.

Sergeant Marmolejo followed the Jeep, radioed the license number to dispatch, summoned other units, and the police stopped the Jeep without incident. Officers found three men inside the Jeep. Appellant, a middle-aged African-American male, was in the driver's seat. Robert Thomas, another African-American male, was in the front passenger seat. Bennie Fuentes, a Hispanic male adult, was in the rear passenger seat.

Appellant handed Sergeant Marmolejo a driver's license bearing the name of Glenn Bernard Washington. However, the photograph on the license did not resemble appellant. Marmolejo thought appellant resembled a circulated photograph that had been taken from a surveillance tape of the recent robberies. As she talked to appellant, Fuentes began to conceal a long, narrow object between the car seats. Officers later determined the object was a hypodermic needle. The syringe was empty but projected the strong odor of heroin in the seat area. The police dispatcher advised officers at the scene that Washington's license belonged to a deceased driver and was suspended.

Officers arrested appellant for possession of a fraudulent driver's license. An officer searched him and found on his person an off-white rock substance that resembled cocaine. The substance was wrapped in a piece of clear plastic and was located in appellant's front coin pocket. When the officer asked about the nature of the substance, appellant said he did not know what it was. The officer said it must be narcotics but appellant denied the rock substance was a narcotic. At trial, the parties stipulated the substance was a usable quantity of cocaine base. Officers also arrested Fuentes and Thomas and took them to police headquarters.

Police searched the Jeep and found a wallet with appellant's identification under the driver's seat. In the center front console, they found a wallet containing Thomas's identification. On the floorboard of the front passenger area, they found Thomas's cell phone. In the rear seat, the police found an empty hypodermic syringe with the needle broken off at the tip. A strong odor of heroin emanated from the seat where the needle was located. Officer Jeremy Maffei, who worked with Sergeant Marmolejo, believed the contents of the syringe had been emptied into the seat. The pocket behind the driver's seat contained a bag filled with syringes, six needles, pieces of aluminum, a hype kit, and a shoe lace.[FN5] One of the syringes was loaded with a black/brown liquid; other syringes contained cotton infused with a black/brown liquid that appeared to be heroin. The parties stipulated the dark liquid in the syringe consisted of a usable quantity of cocaine and heroin.

FN5. Fresno Police Officer Jeremy Maffei testified that narcotics users use pieces of aluminum to burn narcotics before injecting them and use shoelaces to tie off the circulation to their arms.

In the rear cargo area of the Jeep, officers found jackets, shirts, and baseball caps. On top of those clothes, the officers found a black, zippered leather bag. They opened the bag and found a loaded silver revolver pistol. The trial court received the revolver in evidence as People's exhibit No. 18A and the black leather bag as People's exhibit No. 19A.[FN6] A fingerprint analyst examined the revolver for latent prints but found none.

FN6. People's exhibit No. 19 consisted of a brown evidence bag and contained People's exhibit No. 19A, the black, zippered leather bag.

That same day, Detective Camacho conducted a tape-recorded interview with Thomas to determine his involvement with the revolver found in the Jeep. Camacho told Thomas he was under arrest for possession of the revolver and obtained a waiver of Thomas's rights under Miranda v. Arizona (1966) 384 U.S. 436. Detective Camacho did not promise Thomas leniency for his statements. Thomas told Camacho the gun was not his, he knew why he was taken into custody, and he wanted to provide information to the police. Thomas referred to appellant as "Bird" and to Charles Paul Wilson as either "Paul" or "Pelican." Thomas said he, Bird, and Pelican had used heroin together. Wilson had talked about robbing a pharmacy and appellant and Wilson had talked about robbing a Little Caesars Pizza restaurant. Wilson said he used different facial creams to "mess" with the security cameras.

Detective Camacho released Thomas at the conclusion of the interview because Thomas did not know the revolver was in the Jeep. Moreover, Camacho's investigation did not connect Thomas or Fuentes to any robberies. Camacho searched appellant's personal effects and found Wilson's telephone number next to the name "Paul" in an address book. Camacho searched the bedroom of Wilson's residence on November 18, 2004, and found a navy blue trench coat, black nylon gloves,[FN7] a navy blue mechanic's jumpsuit, wigs, and a burgundy-colored eyeglass case containing a "hype kit." Detective Camacho testified a hype kit typically consists of a syringe ordinarily used to inject narcotics. Camacho also located a gray derby cap and several other derby caps in Wilson's residence.

FN7. The black nylon gloves were depicted in a photograph that was admitted into evidence and shown to the jury (People's exhibit No. 17D).

Robert Thomas testified for the prosecution at appellant's trial and admitted he had a long criminal history. He also admitted he was a narcotics addict who was using two to three grams of heroin a day at the time of the offenses. In November 2004, Thomas had known appellant, to whom he referred as "Bird," and Wilson, to whom he referred as "Paul" or "Pelican." [FN8] During this period, the trio spent time together and ingested drugs every day. Thomas was a heroin addict and used two to three grams of the narcotic every day. Appellant and Wilson used a mixture of heroin and cocaine known as a "speedball" or a "John Belushi." Thomas supplied money to purchase drugs and appellant and Wilson knew where to procure them. Thomas said appellant and Wilson sometimes paid him back in the evening and on other occasions they paid him back in drugs. Detective Camacho showed Thomas some photographs that included pictures of Wilson and one Paul Benefield. Thomas said he know Benefield but identified Wilson by the given name "Paul."

At noon on November 16, 2004, Thomas met with appellant and Wilson at the West Side Market. Thomas had injected heroin that morning and was looking to get more. Appellant was seated in a Jeep Cherokee that he either owned or used and Thomas approached him. Thomas, appellant, and Wilson discussed the possibility of getting drugs. During that conversation, appellant sat in the Jeep, Thomas stood next to the Jeep, and Wilson came and went. Thomas talked to them about getting and using drugs. While Thomas did so, appellant took a gun from a zippered black leather case and displayed the weapon. Thomas said they excitedly talked about the weapon and Thomas testified he may have touched the gun.

Appellant brought up the subject of robbery and said he wanted to commit "some more robberies" because he was low on money. Appellant said he was angry at Wilson because the robbery of a pharmacy did not go as planned and the money was insufficient. Appellant said he wanted to go somewhere to show how a robbery should be conducted but he did not go into detail about his role in the pharmacy robbery.

Although there was a further discussion of robbery, Thomas did not pay attention because he was trying to get high on drugs. He thought appellant referred to Little Caesars and other places but he was not paying attention. At one point, appellant asked Thomas whether he would be interested in participating in a robbery. Thomas declined because he did not want to "throw my life away" over small robberies. Thomas said if he were to rob anything, it would have to be something big, such as a bank. Thomas said he did not need to commit robberies because he earned money every day by working at a family-owned funeral home.

Thomas said someone bought drugs at the market and then he, appellant, and Wilson went directly to June Sheldon's Calwa home to use the drugs. They arrived near evening. Appellant brought the black bag and gun into Sheldon's house and Thomas saw the weapon and accessories again. Appellant, Thomas, Wilson, and Sheldon used drugs in Sheldon's home. Several people left the house for beer and drug runs, but Thomas stayed at the house between 30 and 60 minutes. He got high but claimed he had a "strong memory" of what occurred.

Appellant mentioned robbery again at Sheldon's house. He angrily talked about several previous robberies and spoke in general terms about using facial cream during the crimes to "mess with the cameras." Thomas said appellant may have left Sheldon's house at one point but appellant mainly stayed around the house. Wilson may have stepped out of the room where Thomas fixed his drugs, but Thomas believed Wilson did not leave the house at all.

Between 7:30 and 8:00 p.m., Thomas and appellant left Sheldon's home and drove to Men's Wearhouse so Thomas could buy a pair of shoes. Wilson remained at Sheldon's home. En route to the Men's Wearhouse, Thomas received a call on his cell phone from Bennie Fuentes. Fuentes, an acquaintance, said he was being released from Fresno County Jail and asked Thomas to pick him up. Appellant and Thomas drove to the jail, picked Fuentes up, and the trio drove to the Men's Wearhouse. Along the way appellant became nervous because a police car was following them. He asked Thomas to identify him by the name of a male relative in case the police stopped their vehicle. Thomas said, "I thought you said you were legit?" Although appellant explained that his license was "messed up," Thomas was unwilling to provide a false name.

The police eventually pulled the Jeep over, approximately one hour after Thomas had asked appellant to take him to buy shoes. Thomas was worried about whether appellant had done something that day and whether appellant's vehicle had been identified. Thomas said he had not participated in the robberies in any way. However, he knew he had a bad history and would be in a great deal of trouble if he were connected with the robberies. Thomas did not know the Jeep contained a gun and drugs and became upset when the police found them. Thomas said he never rode with guns in a car because he was prohibited from having a weapon due to his record. Thomas said the gun in the Jeep was not his; he knew the gun was associated with appellant.

Thomas said he had seen the zippered bag with the gun several times earlier that day. The bag was inside the Jeep. The first occasion occurred around noon outside the West Side Market. Thomas saw appellant in the Jeep Cherokee with Wilson. They all talked about getting drugs. Appellant displayed a gun to Thomas. Appellant kept the gun in a small,

zippered black leather case. Appellant said he was low on money and wanted to do more robberies.

When Thomas spoke with Detective Camacho, he attempted to avoid being implicated in the robberies. Thomas did not think he was under arrest and did not make any deals with Detective Camacho. He nevertheless hoped the detective would not arrest him if he talked. According to Thomas, he may have told Camacho he hoped he would not be charged with being a felon in possession of a firearm or with possession of narcotics. Thomas also said by talking to Camacho he had the benefit of not being cut off from his daily supply of heroin. Thomas said Camacho did not conduct any tests to determine whether he had heroin in his system.

Thomas told Detective Camacho that appellant and Wilson repeatedly asked him to participate in robberies. Thomas said he declined to get involved in "Mickey Mouse" robberies because he was a former member of the Black Gorilla Family prison gang. Thomas also told Camacho that Wilson or appellant had described a robbery in which a shot had been fired. Thomas said the robbery might have occurred in a doctor's office, but he was not sure about the type of business involved. Thomas also told Camacho where Wilson lived and pointed out Wilson's residence.

At trial, Thomas recalled appellant talking about the robbery of a pharmacy. During that robbery, Wilson laughed and fired a shot when "people didn't want to cooperate." Thomas said appellant was upset with that robbery because it generated insufficient money. Appellant was also angry at Wilson because that robbery did not take place as planned. Thomas identified Wilson in the courtroom. The prosecution played a surveillance camera video recording of still shots from the November 8, 2004, Little Caesars robbery for the jury (People's exh. No. 2). Thomas viewed the same videotape of the charged robbery and identified appellant and Wilson as the robbers depicted in the video. Thomas testified that appellant was the robber holding a gun and dressed in a leather jacket and cap. Thomas said he recognized appellant's leather coat, jeans, gun, and hairstyle. Detective Camacho viewed the same video and testified that appellant and Wilson "positively matched" the subjects depicted in the video. He also said the gun depicted in the video was a revolver and was the same color as the revolver found in the Jeep.

### *Evidence of the Uncharged Crimes*

### Facts underlying the November 5, 2004 robbery of Tower Health

At 4:00 p.m. on November 5, 2004, a tall, thin African-American male entered Tower Health, a vitamin store on North Fulton Street in Fresno. The male, later identified as Charles Wilson, questioned the store manager, Julie Wilson (Julie) about various supplements. Wilson said he needed supplements for his wife because she was going through menopause. Julie told Wilson she had to speak directly to his wife about menopause supplements. Wilson said someone was parking the car and would then come into the store. Julie assumed that Wilson was referring to his wife as the driver.

When Julie told Wilson what he owed for his purchase, Wilson said he did not have the money and was going to use hers. He then put a rectangular black bag[FN9] on the counter and instructed her to place all of the products in the bag. When Julie argued with him, Wilson pulled a small gun from a waist pouch and showed it to her. Julie initially thought the gun was a toy. She tried to call 911 but Wilson became nervous. She then put the telephone down and said she was not calling anyone. Wilson took the safety off the gun, which made a clicking sound. Julie then realized the gun was real, became scared, and began shaking. Wilson pointed the weapon to her side at an angle, fired one bullet at the floor, and knocked a tile off. Julie then filled the bag with vitamins and about $1,000 in cash. Wilson ran out of

the store and Julie called 911.

FN9. Detective Camacho testified the characteristics of the bag marked as People's exhibit No. 19A matched those of the bag seen in a surveillance videotape taken of the Tower Health robbery. Camacho also said the video showed the suspect holding the bag by its loop or handle.

Law enforcement officers subsequently recovered bullet fragments from Tower Health and sent them to the California Department of Justice for analysis. Nancy McCombs, senior criminalist at the Department of Justice crime laboratory in Fresno, compared the fragments with bullets test-fired from People's exhibit No. 18A. McCombs said there was some agreement between the two but the test lacked necessary detail for an identification. Therefore, she could not determine whether the fragments had been fired from People's exhibit No. 18A or from some other gun. The parties stipulated that latent fingerprints were recovered from Tower Health on the date of the robbery but that none matched the prints of appellant, Wilson, Robert Thomas, or Paul Benefield.

On November 17, 2004, Julie viewed a photographic lineup and positively identified Wilson as the robber of Tower Health. At a November 9, 2005, court hearing, Julie identified Wilson and the bag and weapon he used. At appellant's trial, Julie identified Wilson's bag and gun (People's exh. Nos. 18A, 19A). However, Julie said she had never seen appellant before that day of trial. The parties stipulated that video surveillance cameras were running properly at Tower Health on the day of the robbery. The prosecution played a videotape of the robbery for the jury. The videotape depicted the robbery suspect holding a bag by a loop or handle.

**Facts underlying the November 11, 2004 robbery of Subway Sandwich**

At 7:40 p.m. on November 11, 2004, Sunpreet Athwal was working at the Subway Sandwich shop on North Palm Avenue in Fresno. Athwal was helping a coworker ring up a coupon for a customer when a tall, thin African-American male, later identified as Charles Wilson, entered the shop. A second African-American man stood outside the door of the shop. Wilson pushed the customer aside, pulled a small gun from his jacket, pointed the weapon at Athwal and her coworker, and told them to step back. Wilson took the cash out of the register, put it into a zippered black bag, and then left the shop. Wilson and the man at the door walked away together in the direction of the parking lot. Athwal did not get a good look at the face of the second man.

That evening, Athwal told police that Wilson's accomplice was between 6' 1" and 6' 3" tall and weighed between 155 and 175 pounds. She also said Wilson's bag was made of black cloth. The parties stipulated that latent fingerprints were recovered from the Subway restaurant on the date of the robbery and that none of those prints matched the fingerprints of appellant, Wilson, Robert Thomas, or Paul Benefield.

Athwal examined a photographic lineup and positively identified Wilson as the gunman. She also identified him at two hearings prior to trial. At some point, Athwal examined a photo lineup containing appellant's photograph but was unable to identify anyone. At appellant's trial, Athwal could not say whether appellant was the male who stood outside the door of the Subway on the date of the robbery.

At several prior hearings, Athwal identified People's exhibit No. 18A as Wilson's gun and People's exhibit No. 19A as Wilson's bag. At appellant's trial, Athwal testified that People's exhibit No. 19A was similar to the robber's bag and People's exhibit No. 18A was similar to the robber's gun. She based the latter conclusion on the size, handle color, cylinder, and silver plating of the revolver.

**Facts underlying the November 14, 2004 robbery of Little Caesars Pizza**

At 8:00 p.m. on November 14, 2004, Gary Anderson was making pizzas at the Little Caesars restaurant on West Clinton Avenue. He looked toward the cash register and saw his coworker, Andrew Warber, taking money from the safe and handing it to a nearby African-American male. The male, later identified as Charles Wilson, was dressed in a blue jumpsuit and beanie and was holding a blue, zippered bank deposit bag. Wilson displayed a gun and told Warber not to do " 'anything fucking stupid.' " Anderson was singing to the music of a radio at the time and did not actually see the gun or hear Wilson's statement. Wilson took between $400 and $700 from the register and safe and left the restaurant.

After Anderson called 911, he and Warber went outside and spoke to a group of people. Warber told the group members he and Anderson had just been robbed. A woman said she had just seen a man run out of the restaurant to a vehicle resembling a Jeep. The vehicle was located in front of a Longs Drugs store, about halfway through the parking lot. Anderson thought the woman said the vehicle had a dark color but he was unsure of her statement.

At 8:00 p.m., Kimberly Lopez was collecting shopping carts in front of the Longs Drugs store. The store was two storefronts away from the Little Caesars restaurant. Lopez saw a gold Jeep Cherokee parked on the side of Longs. The engine of the vehicle was idling and the back passenger door was open. Lopez saw a tall, thin African-American male walk quickly across the parking from the area of the Little Caesars toward the location of the Jeep. The man was dressed in a dark blue jogging suit and was carrying a shiny white bag. At trial, Lopez said she did not recognize anyone when she viewed a photographic lineup that included Wilson's photograph.[FN10] At a prior hearing, Lopez identified Wilson with 70 percent certainty.

FN10. According to Detective Camacho, Lopez "tentatively identified" Wilson in the lineup. Camacho said he pointed to Wilson's picture and said he looked like the man. However, she was not positive of her identification.

Anderson positively identified Wilson as the robber when he viewed a photographic lineup on November 19, 2004. However, Anderson could not make a positive identification when he saw Wilson in person at a prior hearing. Anderson testified a jumpsuit found in Wilson's home (People's exh. No. 21) looked like the jumpsuit worn by the robber. Lopez testified the man she saw in the parking lot might have been wearing a jumpsuit but she was not certain of that. At trial and at a prior hearing, Anderson did not identify People's exhibit No. 19A as the robber's bag.

Anderson testified that appellant was not the robber and Lopez testified she had never previously seen appellant. Lopez testified the Jeep that appellant was driving on November 16, 2004, looked like the Jeep she had seen in the parking lot on November 14, 2004. She based her conclusion on the make, color, tinted windows, and wheel rims of the vehicle. According to Anderson, another woman reported seeing a Jeep-like vehicle parked in front of Longs. She mentioned the color of the vehicle but Anderson could not recall what color she mentioned. Anderson later testified the woman may have referred to a dark color. However, he was not certain. Based on briefings about the various robberies, police were looking for a tan Jeep Cherokee.

The parties stipulated that law enforcement officers recovered latent fingerprints from the West Clinton Avenue Little Caesars restaurant on the date of the robbery. The parties further stipulated that none of the prints matched the fingerprints of appellant, Wilson, Robert Thomas, or Paul Benefield. The parties also stipulated that video surveillance cameras were operating properly at the Little Caesars restaurant on November 14, 2004. The

prosecution played the videotape of the robbery for the jury at trial. In the opinion of Detective Camacho, the suspect in the videotape appeared to be wearing black nylon gloves.

### Facts underlying the November 16, 2004 robbery of Subway Sandwich Shop

At 6:00 p.m. on November 16, 2004, Ravneet Kaur was working at the Subway Sandwich Shop on East Gettysburg Avenue when a tall, thin, African-American male entered the restaurant. The male was wearing a dress suit and a flat hat. He went to the register and Kaur asked whether she could help him. The man said, " 'Yeah, if you can give me some cash.' " He then pulled a gun out of a bag. The gun was black and had a brown handle. Kaur gave the man about $200. He asked her to open the safe but she said she did not know the combination. He next asked whether she had any money but she answered in the negative.

At about that same time, Nasa James was completing a phone call at a phone booth in the same shopping complex. After finishing his call, James walked across the darkened parking lot to the Subway Restaurant to get something to eat. James was about 100 feet away when he passed a tall man coming from the direction of the Subway. The two men made eye contact and the tall man seemed concerned about James's presence in the parking lot. James recalled the man was wearing a trench coat and was holding a thin, black plastic shopping bag. James also testified the man may have been an African-American with a hat, beard, and dark features.

A few days after the robbery, Kaur viewed a photographic lineup but did not recognize anyone. At trial, she initially identified People's exhibit No. 18A but went on to testify it did not resemble the robber's gun. She explained the robber's gun had a different shape and was black, not silver. She further testified that People's exhibit No. 19A resembled the robber's bag.

On the evening of the offense, James spoke with police officers and said he would be unable to identify the person he saw. On November 22, 2004, James viewed a photographic lineup and pointed to Wilson's picture because the eyes looked familiar. However, James was uncertain and did not want to identify anyone because he had not seen the man clearly due to poor lighting conditions. At trial, James testified that People's exhibit No. 19A resembled the bag he had seen because it was black and shiny. The parties stipulated an investigator had searched for latent fingerprints in the Subway Sandwich restaurant on the date of the robbery but had found none.

(LD 3.)

### DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly,

1    the Court has jurisdiction over the action.

2           On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

3    1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

4    Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

5    F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

6    *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

7    (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

8    filed after the enactment of the AEDPA; thus, it is governed by its provisions.

9    **II.  Legal Standard of Review**

10          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

11   pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

12   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

13          The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

14   Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

15   (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

16   adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

17   application of, clearly established Federal law, as determined by the Supreme Court of the United

18   States" or "resulted in a decision that was based on an unreasonable determination of the facts in

19   light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

20   538 U.S. at 70-71; see Williams, 529 U.S. at 413.

21          As a threshold matter, this Court must "first decide what constitutes 'clearly established

22   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

23   *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

24   must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

25   of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly

26   established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

27   the Supreme Court at the time the state court renders its decision." Id.

28          Finally, this Court must consider whether the state court's decision was "contrary to, or

1   involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72,

2   *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

3   writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

4   question of law or if the state court decides a case differently than [the] Court has on a set of

5   materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72.

6   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

7   court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

8   applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

9          "[A] federal court may not issue the writ simply because the court concludes in its

10   independent judgment that the relevant state court decision applied clearly established federal law

11   erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411. A

12   federal habeas court making the "unreasonable application" inquiry should ask whether the state

13   court's application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 409.

14          Petitioner has the burden of establishing that the decision of the state court is contrary to or

15   involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>,

16   94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states,

17   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

18   decision is objectively unreasonable. <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th

19   Cir.1999).

20          AEDPA requires that we give considerable deference to state court decisions. The state

21   court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

22   interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

23   U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

24   **III.  Review of Petition**

25          **A.  Ground One - Ineffective Assistance of Trial Counsel: Hearsay Evidence/Uncharged**
       **Robbery**
26

27          In his first claim, Petitioner argues defense counsel rendered ineffective assistance in failing

28   to object to the admission of hearsay evidence of an incriminating confession by a witness and

1    evidence of an uncharged robbery.

2         This claim relating to the fourth uncharged robbery was presented on direct appeal to the

3    Fifth DCA, where it was rejected in a reasoned opinion. (LD 3.) Petitioner then presented the claim

4    to the California Supreme Court where it was summarily denied. (LD 4.) The California Supreme

5    Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied

6    the claim presented for the same reasons stated in the opinion of the Fifth DCA. <u>Ylst v.</u>

7    <u>Nunnemaker</u>, 501 U.S. 797, 803 (1991).

8         The claim relating to the admission of hearsay evidence was also presented to the Fifth DCA

9    where it was rejected in a reasoned opinion. (LD 3.)  Petitioner did not present it to the California

10   Supreme Court. Therefore, as Respondent correctly argues, the claim is unexhausted and should be

11   dismissed. 28 U.S.C. § 2254(b)(1). In any case, the claim is without merit.

12        The appellate court discussed and denied Petitioner's claim as follows:

13        Appellant contends reversal is required because his trial attorney rendered
          constitutionally ineffective assistance of counsel.

14

15        He specifically argues:

16        "At trial, Robert Thomas testified that he thought appellant said something about
          Little Caesars during their discussion at West Side Market on November 16, 2004,
          but he wasn't really paying attention because he was trying to get high. This was
17        Thomas's only testimony regarding Little Caesars.

18        "After Thomas finished testifying, Detective Camacho took the stand and testified
          that, during his interview with Thomas on November 16, 2004, Thomas said that Wilson and
19        appellant had talked about doing a Little Caesars Pizza robbery. When questioned about who
          made the statements, Camacho testified that 'they had spoken about committing a Little
20        Caesars Pizza robbery.' Defense counsel made no objection to this testimony. His failure to
          object on hearsay grounds to Camacho's testimony about Wilson's confession to committing a
21        Little Caesars robbery with appellant and his failure to move to strike the evidence or to
          move for a mistrial deprived appellant of effective assistance of counsel."

22

23        As to the failure to object, an appellant bears the burden of proving ineffective
          assistance of counsel. (*People v. Haskett* (1990) 52 Cal.3d 210, 248; *People v. Pope* (1979)
          23 Cal.3d 412, 425.) To establish constitutionally inadequate representation, the defendant
24        must show that (1) counsel's representation was deficient, i.e., it fell below an objective
          standard of reasonableness under prevailing professional norms, and (2) counsel's
25        representation subjected the defense to prejudice, i.e., there is a reasonable probability that
          but for counsel's failings the result would have been more favorable. (*People v. Haskett,*
26        *supra,* at p. 248; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

27        Judicial scrutiny of an attorney's performance must be highly deferential. (*Strickland
          v. Washington* (1984) 466 U.S. 668, 689 .) We presume that counsel's conduct falls within
28        the wide range of reasonable professional assistance, and we accord great deference to

counsel's tactical decisions. Were it otherwise, appellate courts would be required to engage in the perilous process of second-guessing counsel's trial strategy. (*People v. Frye* (1998) 18 Cal.4th 894, 979.) Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) On direct appeal, a reviewing court will reverse a conviction for ineffective assistance of counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his or her act or omission. (*People v. Ray* (1996) 13 Cal.4th 313, 349; *People v. Fosselman* (1983) 33 Cal.3d 572, 581.) Furthermore, counsel need not make a meritless objection to avoid an appellate claim of ineffective assistance. (*People v. Ochoa* (1998) 19 Cal.4th 353, 432.)

On direct examination during the prosecution's case-in-chief, Thomas testified about a sequence of events that occurred on November 16, 2004. Thomas was with appellant and Charles Paul Wilson. Appellant sat in the Jeep with a door open, Thomas stood outside the Jeep, and Wilson walked back and forth near the vehicle. Appellant brought up the subject of robbery, explaining he was "low on ins,"[FN11] i.e., money. Appellant told Thomas he wanted to do some more robberies. Appellant described the prior robbery of a pharmacy during which Wilson fired a shot. Wilson started laughing as appellant described the robbery. Appellant then became angry because the money was not enough and became angry at Wilson because the robbery did not go as planned. Appellant told Thomas he wanted "to go off in the place and show how the robbery was supposed to be done." During the conversation, appellant, Wilson, and Thomas were looking "to go cop some drugs." According to Thomas, appellant mentioned several other places in connection with the commission of robberies. Thomas testified, "I think he said something about Little Caesars, two more places, I wasn't really paying too much attention to the other places, but that was one of them that was mentioned." Thomas said he was not really paying attention because he "was trying to get high at the time." Appellant eventually asked Thomas if would be interested in participating in some robberies. Thomas told appellant he was not interested in the "Mickey Mouse" or "little odds and ends robbery jobs they were doing." Thomas explained if he was going to participate in a robbery, it would have to be "a bank or something like that." Thomas also said appellant brought up the subject of robberies a second time after they went to June Sheldon's Calwa residence.

FN11. According to Thomas, "low on ins" was a phrase from Ebonics meaning "low on money." "Ebonics" is also known as "African American Vernacular English." (Webster's II New College Dict. (2001) p. 356, col. 1.)

Detective Camacho subsequently testified during the People's case-in-chief. On direct examination, Camacho said he spoke with Thomas to determine his involvement with or connection to the weapon found in the Jeep Cherokee. During Camacho's direct testimony, the following exchange occurred:

"Q [by Deputy District Attorney Treisman] With regard to his association with Bird or how he knew him, did he explain that to you?

"A [by Detective Camacho] Yes, he did.

"Q Did he also describe or mention an individual by the name of Paul or Pelican?

"A Yes, he did.

"Q And did he explain how, if at all, he knew this individual?

"A He said that they all used heroin together.

"Q With regard to their use of heroin, he had already acknowledged his own use of heroin, did he explain anything else about these individuals?

"A Yeah, he explained to me that they had, Pelican, or Paul, had talked about committing a prior robbery at a pharmacy, or what he thought was a pharmacy. And that he and Paul, as far as Pelican and Paul, had talked about doing a Little Caesars Pizza robbery as well.

"Q I'm sorry, who and Paul had talked about doing Little Caesars?

"A Pelican and Paul, which would be Mr. Wilson and Mr. Washington.

"Q I'm sorry, Bird and-I'm getting confused. Paul and Pelican, are those the same people?

"A Yes.

"Q And Bird is a separate individual?

"A Yes.

"Q So who spoke of doing a Little Caesars? Mr. Thomas spoke of who?

"A He said that during a conversation that they had spoken about committing a Little Caesars Pizza robbery.

"Q I see. You heard Mr. Thomas' testimony here yesterday and today?

"A Yes.

"Q Okay. Did that testimony, other than giving the specific person whose residence it was on Calwa, other than that, did his testimony differ from his statement to you?

"A No."

The prosecutor stated in relevant part in opening argument:

"Mr. Thomas acknowledged that he's a drug user, and that, and he said that the people he knew, Bird, Mr. Washington, Pelican or Paul who he knows as Mr. Wilson, were drug users. And what we find is that, pardon me, Mr. Washington has cocaine in his pocket, and we know that in particular they would speedball, that is Mr. Wilson and Mr. Washington, and that is a mixture of cocaine and heroin.... [¶] ... [¶]

"He also said that Mr. Washington in particular did the talking, but Mr. Wilson was there, and acknowledged talking about, robberies that were occurring. One, sounding distinctly like the Tower Health robbery, where a shot was fired, they described it as a pharmacy. Mr. Revvill [defense counsel] talked about it being a doctor's office, Detective Camacho did not recall that, but it was a business seeming like a pharmacy to Mr. Thomas.

"Now, again, there's no evidence that Mr. Thomas was there or participated, he's not saying he participated, he's not involved in those robberies, but he's hearing about them and he's telling you what he knows about them. Could he give a lot of detail? The answer to that is no, not a lot of detail. He's relating what they said, what Mr. Washington in particular said.

"And you know from the circumstances, Ladies and Gentlemen, piece to together what Mr. Thomas said, because I'm talking about what supports Mr. Thomas in regard to these events. Mr. Thomas said that they were arguing. There was heat between Mr. Washington and Mr. Wilson, and that is because that robbery did not go as it should. A shot fired, the amount of time that he spent inside of that restaurant, excuse me, that health store, cannot possibly be how you plan a robbery. You don't want to be identified, you don't want things to, people to have an opportunity to get to know your face, so it did not go the way Mr. Wilson had in mind, and Mr. Washington is saying that. So it apparently was the case that he planned it with him, so he's going to show him, and did show him, how to commit a robbery. And that is the robbery we see at the Little Caesars with Mr. Cruz."

Defense counsel stated at closing argument:

"You might also recall that when, you know, push comes to shove about some of the details what people have said, like well, we were doing crimes and this is probably the so-called confession, Washington said, 'Wilson and I did a Little Caesars.' Okay? But one of the things that, and we don't know if that's just Wilson talking, or that now it's Mr. Washington because he needs it to be Mr. Washington, because Mr. Washington is in the car. But when they are, on the 16th of November, 2004, talking outside of the Jeep, inside and outside of the Jeep, I guess, he says that, you know, there's more robbery talk that's happening, and he said, you know, they talked about Little Caesars and a couple of other places, but I really wasn't paying attention because I was trying to get high, so there's always kind of a way for Mr. Thomas to kind of, you know, fudge a little bit so that he doesn't have to be perfectly clear. He just has to keep implicating a person and it has to be Washington because Washington is the fella in the car."

The prosecutor stated during closing argument:

"It is Mr. Thomas' statement and some of the lack of detail, he can't say that Mr. Washington was involved in each of these robberies. In fact, if he were out to get somebody, he would have. If he were trying to get somebody, he would have said it. Who could refute it? But that's not what he said. He said what Mr. Washington told him, which is that there was this event at what seemed to be a pharmacy, it went awry, and he's upset, Mr. Washington is upset with Mr. Wilson about that. And so he's going to show him how it's done, and then they do a Little Caesars. That's the tone, that's the content of the statement overall.

"And they do others together, but it is unclear whether Washington is just relating those, or whether he's saying he's involved in them. That isn't clear. Seems like it. But you don't charge things based on seems like, you charge things based on what the evidence is. So when you look at the videotape and you see Mr. Washington, and you have evidence independent of that, that Mr. Thomas saying that it's Mr. Washington, and when you know there is a connection between Mr. Washington and Mr. Wilson, and you know Mr. Wilson did that robbery, then you bring your charges. And that's what we have done, and here we are."

Appellant now argues:

"Camacho's testimony about Wilson's statement was hearsay because it was evidence of an out-of-court statement that was offered into evidence for its truth. Camacho's testimony involves multiple hearsay because Camacho testified to Thomas's statement about Wilson's statement. Thus, there were two levels of hearsay: (1) Wilson's out-of-court statement and (2) Thomas's out-of-court statement to Camacho about Wilson's

statement. [¶] ... [¶]

"Camacho's testimony about Wilson's statement was extremely prejudicial, since Wilson was identified as the perpetrator of the charged Little Caesars robbery and three uncharged robberies, and Wilson's statement identified appellant as his accomplice in a Little Caesars robbery. There is no possible legitimate tactical reason for defense counsel's failure to object to this evidence....

"The record shows defense counsel had no valid tactical reason for failing to object to the admission of the statement. Defense counsel based his motion for severance in large part on the extreme prejudice to appellant of that same statement, which he quoted in his written motion as follows: ' "Thomas stated that during one of many conversations with Wilson, he advised Thomas that he and Washington had done a Little Caesar's Pizza robbery...." ' Since defense counsel sought and obtained severance based on the prejudicial impact of this statement, he obviously had no valid tactical reason to let the evidence be admitted in appellant's trial ."

Appellant overstates the record evidence and his contention must be rejected. Without citing to the record, appellant claims "Wilson's statement identified appellant as his accomplice in a Little Caesars robbery." According to the record, Thomas said appellant spoke of a pharmacy robbery committed with Wilson and of appellant's interest in committing additional robberies. Thomas testified that appellant "said something about Little Caesars, two more places" but Thomas never specifically testified that appellant had committed or claimed to commit robberies of Little Caesars restaurants. Detective Camacho testified "Pelican and Paul, had talked about doing a Little Caesars Pizza robbery as well." Camacho initially explained, "Pelican and Paul, which would be Mr. Wilson and Mr. Washington." However, upon further questioning, Camacho acknowledged that "Paul and Pelican" were the same person. [FN12] Camacho testified that Charles Paul Wilson was the Paul or Pelican to which Thomas referred in his interview with Camacho.

FN12. At an Evidence Code section 403 hearing held on November 4, 2005, Thomas testified that he knew Charles Paul Wilson as "Paul" or "Pelican" and appellant as "Bird."

Generally speaking, a defense counsel's failure to object to inadmissible evidence is a matter of trial tactics which the appellate court will not second-guess. (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.) Trial counsel is accorded wide latitude and discretion with respect to trial tactics and strategy. However, the exercise of that discretion must be reasonable. (*People v. Frierson* (1979) 25 Cal.3d 142, 166.) If the record on appeal sheds no light on why counsel acted or failed to act in the challenged manner, the claim on appeal must be rejected unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation. (*People v. Bolin, supra,* 18 Cal.4th at p. 333.)

Here, the record on appeal does not reflect why defense counsel did not object to Thomas's hearsay statements about the robbery of a Little Caesars Pizza restaurant. Appellant submits there is no possible legitimate tactical reason for defense counsel's failure to object to this evidence. In our view, trial counsel could have had several legitimate tactical purposes for declining to interpose an objection. First, the hearsay statements were somewhat oblique and convoluted. Defense counsel may have reasonably concluded that an ambiguous record was more likely to generate reasonable doubt in the minds of the jurors. Moreover, the interposition of a defense objection would have conceivably prodded the prosecution to elicit clarifying statements, thereby eliminating such doubt and irreparably damaging the defense case. Second, Thomas testified it was appellant who spoke about the robbery of a Little Caesars Pizza restaurant. Detective Camacho testified that he interviewed Thomas and the latter attributed the statement about Little Caesars to Wilson rather than appellant. From this

state of the evidence, defense counsel could have reasonably concluded the statement was admissible as a prior inconsistent statement (Evid.Code, § 1235). Third, as respondent points out, defense counsel may have elected not to object to Camacho's testimony because it tended to show Thomas's unreliability as a witness or his lack of credibility. The testimony tended to show unreliability because it demonstrated Thomas could not accurately recall who said what about the robberies. The testimony also tended to show lack of credibility because it suggested that Thomas shifted blame to appellant in an effort to avoid responsibility for the firearm that officers found in the Jeep.

Finally, even assuming arguendo a deficient performance by trial counsel, appellant has failed to affirmatively prove prejudice, i.e., a reasonable probability that, but for counsel's errors or omissions, the result of the proceeding would have been different. (*People v. Ledesma, supra,* 43 Cal.3d at pp. 217-218.) Appellant maintains Camacho's testimony about Wilson's statement was "extremely prejudicial" because "Wilson was identified as the perpetrator of the charged Little Caesars robbery and three uncharged robberies, and Wilson's statement identified appellant as his accomplice in a Little Caesars robbery." A careful reading of the challenged portion of the record reveals that Camacho's recitation of Wilson's statement was simply not as clear or as damaging as appellant suggests. Moreover, the prosecution played a surveillance video recording of the November 8, 2004, Little Caesars Pizza robbery for the jury to view. From the videotape, the jurors could have independently determined whether or not the accused participated in the charged offense. In light of that demonstrative evidence, it is not reasonably probable that appellant would have obtained a more favorable result had defense counsel objected to Detective Camacho's testimony about Wilson's interview statements.

(LD 3.)

As to Petitioner's claim that defense counsel failed to object to the introduction of evidence of a fourth, uncharged robbery, the state court stated:

As noted above, on direct appeal a reviewing court will reverse a conviction for ineffective assistance of counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his or her act or omission. (*People v. Ray, supra,* 13 Cal.4th at p.349.) Here, as appellant himself observes, defense counsel could have reasonably concluded that Thomas's chronology provided him with an alibi because he, Thomas, and Wilson were at Sheldon's Calwa residence at the time the robbery occurred on East Gettysburg Avenue. Although Thomas said appellant may have left Sheldon's home at one point, counsel could have reasonably determined that appellant could not have departed the Sheldon home, traveled to the Subway location, and returned to the Sheldon home within the narrow window of time described by Thomas. Such a tactical decision precludes a finding of ineffective assistance of counsel.

(LD 3.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687; Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was

deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Id. at 688.  The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. Id. at 692; United States v. Cronic, 466 U.S., at 659, and n.25 (1984).

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d 1058, 1062 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [United States Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  The habeas corpus applicant bears the burden to show that the state court applied United States

1   Supreme Court precedent in an objectively unreasonable manner.   <u>Price v. Vincent</u>, 538 U.S. 634,

2   640 (2003).

3       In analyzing and rejecting this claim, the appellate court applied the <u>Strickland</u> standard and

4   determined that Petitioner had failed to demonstrate that counsel erred or that any potential error was

5   prejudicial. Although the record is silent as to why counsel failed or decided not to object to

6   Detective Camacho's testimony, the appellate court noted several different legitimate reasons why

7   counsel may have opted not to object: 1) The hearsay statements were convoluted and oblique

8   thereby making it more likely to generate reasonable doubt, so that an objection might have

9   prompted the prosecutor to clarify the statements thereby eliminating any doubt; 2) Witness

10  Thomas's testimony was different from Detective Camacho's; therefore, counsel may have

11  concluded the statement was admissible as a prior inconsistent statement (Cal. Evid. Code § 1235);

12  3) Counsel may have elected to leave the state of the evidence as is, because Thomas's vague

13  statements tended to show unreliability and a lack of credibility; and 4) As to the fourth, uncharged

14  robbery, counsel may have elected not to object because counsel may have believed the chronology

15  of the events as described in the testimony provided Petitioner with an alibi for one of the charged

16  offenses. In light of these legitimate tactical purposes, the appellate court found that counsel acted

17  reasonably in not objecting to the testimony.

18      In addition, the appellate court also found Petitioner failed to demonstrate that any error was

19  prejudicial, i.e., a reasonable probability that, but for counsel's errors or omissions, the outcome

20  would have been different. First, the court noted that the challenged statements did not clearly

21  implicate Petitioner as he argued. And second, a surveillance video recording of the incident was

22  played to the jury from which the jurors could independently determine that Petitioner was a

23  participant in the crime.

24      Given the state of the evidence, this Court finds the state court did not unreasonably apply the

25  <u>Strickland</u> standard. Petitioner does not demonstrate that counsel's actions were unreasonable or that,

26  but for counsel's omission, the result would have been different.

27      **B.  Ground Two - Abuse of Discretion and Violation of Cal. Evid. Code § 352**

28      In his next claim for relief, Petitioner argues the trial court abused its discretion by admitting

1   evidence of three uncharged robberies and Petitioner's possession of drugs in violation of Cal. Evid.

2   Code § 352.

3        The admissibility of evidence is a matter of state law; improper admission of evidence does

4   not usually violate the U.S. Constitution and is normally not cognizable in federal habeas corpus.

5   Estelle v. McGuire, 502 U.S. 62, 68 (1991).  Nevertheless, there can be habeas relief for the

6   admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial

7   of due process.  Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191

8   (1994).  Petitioner must show that there were no permissible inferences to be drawn from admitted

9   evidence and that the evidence is "of such quality as necessarily prevents a fair trial." Jammal v. Van

10  de Kamp, 926 F.2d 918, 920 (9th Cir.1991), *quoting* Kealohapauole v. Shimoda, 800 F.2d 1463,

11  1465 (9th Cir.1986).

12       In this case, the appellate court evaluated the admission of the evidence according to the

13  standards set forth in Cal. Evid. Code § 352. The court considered the evidence and determined that

14  the probative value was not substantially outweighed by the probability that admission of the

15  evidence would necessitate undue consumption of time, or create substantial danger of undue

16  prejudice, of confusing the issues, or of misleading the jury. Cal. Evid. Code § 352. Petitioner's

17  challenge is entirely a state law claim and is not cognizable. Moreover, he has not demonstrated that

18  there were no permissible inferences to be drawn from the evidence or that the evidence was of such

19  quality that a fair trial could not be had. The claim should be rejected.

20       **C.  Ground Three - Ineffective Assistance of Counsel - Pretrial Investigation**

21       Petitioner also claims trial counsel was ineffective in failing to perform certain pre-trial tasks

22  such as investigation and preparation for trial. The claim is completely conclusory in that Petitioner

23  fails to provide any specifics on counsel's failures. Moreover, as Respondent points out, the claim is

24  unexhausted because Petitioner did not present is to the state courts. 28 U.S.C. § 2254(b)(1).

25  Therefore, it should be dismissed.

26       **D.  Ground Four - Cumulative Error**

27       Finally, Petitioner claims that habeas relief should be granted in light of the cumulative effect

28  of the errors alleged. He asserts the errors, both individually and cumulatively, violate his due

1    process right to a fair trial.

2         A defendant may prove that he has suffered prejudice based on the cumulative effect of

3    errors. Kyles v. Whitley, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory

4    evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required

5    to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only

6    conducts piecemeal analysis of each item of suppressed evidence); O'Neal v. McAninch, 513 U.S.

7    432, 435-36 (1995) (accepting lower court's assumption that "confusion arising out of a trial court

8    instruction about the state of mind necessary for conviction combined with a related statement by a

9    prosecutor" required habeas corpus relief if "combined" error was not harmless); Fuller v. Roe, 182

10   F.3d 699, 704 (9th Cir.1999) ("cumulative effect of several errors may prejudice a defendant to the

11   extent that his conviction must be overturned"); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th

12   Cir.1978) (concluding cumulative effect of alleged errors may demonstrate prejudice), *cert. denied*,

13   440 U.S. 974 (1979).

14        In this case, however, none of the claims raised by Petitioner have merit.  Accordingly,

15   Petitioner cannot demonstrate prejudice resulting from the cumulative effect of the errors, because

16   there are no errors affecting the verdict to accumulate. See Villafuerte v. Stewart, 111 F.3d 616, 632,

17   (9th Cir.1997) (*per curiam*). The claim should be rejected.

18                                    **RECOMMENDATION**

19        Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

20   DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

21   Respondent.

22        This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

23   States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

24   of the Local Rules of Practice for the United States District Court, Eastern District of California.

25   Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party

26   may file written objections with the court and serve a copy on all parties.  Such a document should

27   be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

28   objections shall be served and filed within ten (10) court days (plus three days if served by mail) after

1   service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28

2   U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

3   time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

4   Cir. 1991).

5

6        IT IS SO ORDERED.

7        **Dated:    July 10, 2009            /s/ Gary S. Austin**
                                      UNITED STATES MAGISTRATE JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28